NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1525-21
A-1548-21

NEW JERSEY STATE
POLICEMEN'S BENEVOLENT
ASSOCIATION,[1]

     Plaintiff-Appellant,

v.

PHILIP D. MURPHY, GOVERNOR
OF NEW JERSEY,

     Defendant-Respondent.

_____

NEW JERSEY SUPERIOR OFFICERS
LAW ENFORCEMENT ASSOCIATION,

     Plaintiff-Appellant,

v.

PHILIP D. MURPHY, GOVERNOR
OF NEW JERSEY,

     Defendant-Respondent.

_____

<table>
<tr><td><strong>APPROVED FOR PUBLICATION</strong></td></tr>
<tr><td><strong>February 11, 2022</strong></td></tr>
<tr><td><strong>APPELLATE DIVISION</strong></td></tr>
</table>

---

[1] Including the following New Jersey State Policemen's Benevolent Associations: PBA Locals 105, 109, 109A, 122, 134, 134A, 152, 152A, 167, 167A, 177, 177A, 197, 197A, 199, 231, 240, 249, 249A, 258, 258A, 298, 351, 378, 378A, 382, and 400.

Argued February 8, 2022 – Decided February 11, 2022

Before Judges Fisher, Currier and Smith.

On appeal from Executive Order No. 283.

Frank M. Crivelli argued the cause for appellant New Jersey State Policemen's Association (Crivelli, Barbati & DeRose, LLC, attorneys, Frank M. Crivelli, of counsel and on the briefs; Donald C. Barbati and Michael P. DeRose, on the briefs).

Kevin D. Jarvis argued the cause for appellant New Jersey Superior Officers Law Enforcement Association (O'Brien, Belland & Bushinsky, LLC, attorneys; Kevin D. Jarvis, on the briefs).

Angela Cai, Deputy State Solicitor, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Jeremy M. Feigenbaum, State Solicitor, Angela Cai, and Donna Sue Arons, Assistant Attorney General, of counsel and on the brief; Carlene Dooley, Nathaniel Levy, Tim Sheehan, Marie Soueid, and Ryan Silver, Deputy Attorneys General, on the brief).

Michael R. Noveck, Assistant Deputy Public Defender, argued the cause for amici curiae New Jersey Office of the Public Defender, American Civil Liberties Union of New Jersey, Rutgers Criminal and Youth Justice Clinic, New Jersey Prison Justice Watch, Transformative Justice Initiative, and Salvation and Social Justice (Joseph E. Krakora, Public Defender, and American Civil Liberties Union of New Jersey Foundation, attorneys; Michael R. Noveck, of counsel and on the brief; Jeanne Locicero and Alexander Shalom, on the brief).

Jeff Dubner (Democracy Forward Foundation) of the District of Columbia and New York bars, admitted pro hac vice, argued the cause for amici curiae American Medical Association, American College of Correctional Physicians, and Medical Society of New Jersey (Greenbaum, Rowe, Smith & Davis, LLP, Jeff Dubner, Rachel L. Fried (Democracy Forward Foundation) of the District of Columbia and New York bars, admitted pro hac vice, and JoAnn Kintz (Democracy Forward Foundation) of the Colorado bar, admitted pro hac vice, attorneys; John Zen Jackson, Rachel L. Fried, and Joann Kintz, on the brief).

Peter Demkovitz argued the cause for amicus curiae The New Jersey State Lodge of the Fraternal Order of Police (Markowitz and Richman, attorneys; Matthew D. Areman, on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

COVID-19 has now killed more than 900,000 and hospitalized about 4,000,000 Americans. See Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, 142 S. Ct. 661, 670 (2022) (dissenting opinion). At least 75,000,000 Americans have been infected since the virus hit our shores. The fatalities include more than 31,000 New Jerseyans. Nearly 20% of all New Jerseyans have contracted COVID-19 during the pandemic's course and, because it is a circumstance of importance here, 54% of those incarcerated in New Jersey have contracted COVID-19. We need not recount the countless ways the virus has impacted New

Jerseyans in their workplaces, schools, recreational areas, and homes. The virus has had a devastating and drastic impact on our economy and our way of life, N.J. Republican State Comm. v. Murphy, 243 N.J. 574, 580-81 (2020) (observing that "laypeople, scientists, and legal scholars alike would agree that COVID-19 is a true disaster with widespread consequences"), as recognized in the emergency declarations issued by President Joseph R. Biden, Governor Philip D. Murphy, and our Chief Justice, that we alluded to in recently upholding Newark's imposition of a vaccination mandate for its employees. See In re City of Newark, 469 N.J. Super. 366, 387-89 (App. Div. 2021).

The recent rise of the Omicron variant generated a spike in infections and hospitalizations. On January 19, 2022, having considered information provided by the Centers for Disease Control and Prevention (CDC), Governor Murphy issued Executive Order 283, requiring, among other things, that corrections officers – because of the nature of the facilities in which they work – present proof of vaccination by February 16, 2022, or face discipline, including the possibility of termination.

Executive Order 283's vaccination mandate prompted The New Jersey State Police Benevolent Association (PBA) and the New Jersey Superior Law

Enforcement Association (SOA), on behalf of their memberships,[2] to separately appeal[3] to this court, arguing the Governor: lacked the authority to mandate vaccinations; acted arbitrarily by failing to adequately tailor the executive order to the magnitude of the emergency; failed to comply with statutory procedural requirements; and violated the constitutional rights of appellants' members. Finding no merit in any of appellants' arguments, we dismiss the appeal.

I

We briefly explain the procedural events that brought us to this point.

On January 11, 2022, Governor Murphy re-declared a public health emergency by issuing Executive Order 280. Eight days later, the Governor issued Executive Order 283, which contains the provisions criticized by appellants in this appeal. Executive Order 283 superseded Executive Order 252's vaccine-or-test approach and imposes a vaccination mandate for all workers in "covered high-risk congregate settings," which includes correctional facilities. The order requires covered workers – absent the approval of an application for

---

[2] The PBA asserts that it represents 33,000 active and 17,000 retired law enforcement officers throughout the State at all levels of government. The SOA asserts that it represents supervisory law enforcement personnel holding the rank of lieutenant in various state agencies.

[3] We now consolidate these appeals and decide them by way of this single opinion.

A-1525-21

an exemption[4] – to obtain their "first dose of the primary series" of a vaccine by February 16, 2022, and to submit proof "that they are up to date with their COVID-19 vaccinations by March 30, 2022, or within 3 weeks of becoming eligible for a booster dose, whichever is later." The order also requires "covered settings" to establish a disciplinary process for noncompliance that may include termination from employment.

Executive Order 283 also requires "covered settings" to continue mandating regular testing for workers already subject to testing under Executive Order 252 until the submission of sufficient proof of vaccination. Executive Order 283 does not mandate testing after proof of vaccination is submitted, but it does not foreclose it.[5] The order states that of the many driving forces behind these requirements was the desire to raise the protective floor through vaccinations for "congregate and health care settings because of the significant risk of spread and vulnerability of the populations served."

---

[4] Executive Order 283 requires appropriate accommodation for employees who request exemptions for disabilities, medical conditions or "sincerely held" religious beliefs.

[5] The Attorney General advises that both the Department of Corrections and the Juvenile Justice Commission plan on continuing a testing regime.

On Friday, January 21, 2022, appellants separately wrote to the Governor for a stay of Executive Order 283 pending appeal. Having received no response by Monday, January 24, 2022, appellants filed applications with this court for permission to move for a stay on an expedited basis. We immediately granted the request and provided a briefing schedule; the parties were directed to brief both the question whether a stay should issue and the merits of the appeal so that, if feasible, the court could rule on the merits of the appeal prior to Executive Order 283's initial February 16, 2022 deadline.

After receiving the principal briefs of both appellants and the Attorney General, the court advised the parties that it likely would proceed to hear the merits of the appeal. We have since received the helpful submissions of amici on both sides of the issue and have now heard the oral argument of counsel and amici.

No party claims that the manner in which the dispute has come before us is faulty or in any way deprives them of due process. And no party has argued that the court should not proceed to resolve the merits of the appeal.

A-1525-21

## II

## A

It is beyond rational dispute that the Governor possessed the authority to issue Executive Order 283 under the Civilian Defense and Disaster Control Act, N.J.S.A. App. A:9-33 to -63 (the Disaster Control Act), which "vests the Governor with broad powers to provide for the health, safety and welfare of the people of the State during any 'emergency.'" Worthington v. Fauver, 88 N.J. 183, 193-94 (1982); Kravitz v. Murphy, 468 N.J. Super. 592, 613-14 (App. Div. 2021). The Disaster Control Act defines an emergency as including a "disaster," which is "any unusual incident resulting from natural or unnatural causes which endangers the health, safety or resources of the residents of one or more municipalities of the State, and which is or may become too large in scope or unusual in type to be handled in its entirety by regular municipal operating services." N.J.S.A. App. A:9-33.1(1). COVID-19 certainly fits that bill. In addition, the Governor need not wait until disaster strikes; if there is a substantial likelihood of a disaster, the Governor is empowered. Worthington, 88 N.J. at 196-97.

A-1525-21

B

Although unnecessary to our determination, we find the Governor was also empowered by the Emergency Health Powers Act, N.J.S.A. 26:13-1 to -31 (the Emergency Health Act), which authorizes the Governor to "take all reasonable and necessary measures to prevent the transmission of infectious disease." N.J.S.A. 26:13-12. Although this statute refers to the power of the Commissioner of Health to take such steps, N.J.S.A. 26:13-3(f) recognizes that the Commissioner's orders remain in effect "until superseded by order of the Governor" under the Disaster Control Act, clearly conveying that the Governor is empowered to Act to combat health emergencies and, on acting under the Disaster Control Act, is the final word on the subject.

Appellants argue the Emergency Health Act does not provide a basis for Executive Order 283 because of the June 4, 2021 enactment of L. 2021, c. 103 (codified at N.J.S.A. 26:13-32 to -36). Section 1 of this act (Chapter 103) declares that all executive orders issued by the Governor "prior to the effective date of this act" – insofar as they "relied on the existence of the public health emergency declared . . . in Executive Order No. 103 of 2020,[6] as extended" –

---

[6] Among other things, Executive Order 103 declared that, as of March 9, 2020, the State was encountering a public health emergency due to the COVID-19

and except for those listed in the statute, "shall expire" thirty days after the act's adoption. Section 3 contains three subsections which declare that: (a) any administrative order, directive or waiver by an agency head that relied on the existence of the public health emergency declared in Executive Order 103, shall expire on January 11, 2022; (b) the Governor "shall notify the Legislature by January 1, 2022[,] if the Governor determines that it is necessary or appropriate to continue for an additional 90 days beyond January 11, 2022[,]" of any administrative order, directive or waiver referred to in subsection (a); and (c) notwithstanding subsection (a), the provisions of any administrative order, directive or waiver issued by the Department of Health that relied on the public health emergency declared in Executive Order 103, as extended, that "govern[] staffing ratios, overtime, shifts, and vacation time[,] shall remain in force and effect until September 1, 2021."

Appellants argue that these provisions, without further approval of the Legislature, precluded the declaration of a public health emergency on or after January 11, 2022 – a meaning we do not attribute to these provisions. By way of section 5, the Legislature acknowledged that, despite the termination of the

---

pandemic. This order was based not only on the Emergency Health Act but also on the Disaster Control Act.

public health emergency declared in Executive Order 103, the Governor remained empowered to issue:

> orders, directives, and waivers pursuant to [N.J.S.A. 26:13-1 to -36] related to (1) vaccination distribution, administration, and management, (2) COVID-19 testing, (3) health resource and personnel allocation, (4) data collection, retention, sharing, and access, (5) coordination of local health departments, and (6) implementation of any applicable recommendations of the [CDC] to prevent or limit the transmission of COVID-19, including in specific settings.

These provisions arguably provide a basis for a vaccination mandate in the setting described in Executive Order 283, since the CDC recommends that "high COVID-19 vaccination coverage is critical to protect staff and people who are incarcerated [or] detained," and "[s]taff vaccination coverage is particularly important given their frequent contact with the outside community, which creates the opportunity for potential introduction [of the virus] to the facility."[7]

Appellants also argue that Chapter 103 declares that the "authority granted [in section 5] shall last until January 11, 2022, unless the Governor notifies the Legislature by January 1, 2022 that the authority granted by this section is

---

[7] See Ctr. for Disease Control, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last updated June 9, 2021).

A-1525-21

necessary to combat the continuing threat posed by COVID-19 and should last another 90 days." As noted earlier, the Governor re-declared a public health emergency by issuing Executive Order 280 on January 11, 2022. It would appear that the Governor was no longer acting to extend the authority provided by preexisting laws but had, instead, recognized the re-emergence of a public health emergency. We see nothing about Chapter 103's scope that prevented the Governor from taking that action. Chapter 103 was designed to limit the authority arising from the prior declaration of a public health emergency, not the order which issued on January 11, 2022.

Even if appellants are correct that Chapter 103 somehow limited the Governor's ability to act for the benefit of the public under the Emergency Health Act when, on January 11, 2022, he issued Executive Order 280, or in later issuing Executive Order 283, there is nothing about Chapter 103 that limits the Governor's authority under the Disaster Control Act. Indeed, Chapter 103 clearly states in section 4 that the termination of the public health emergency declared in Executive Order 103, as extended, "shall in no way diminish, limit, or impair the powers of the Governor or the head of a State agency pursuant to [the Disaster Control Act]," and that the "state of emergency" declared in Executive Order 103 "shall remain in effect until terminated by the Governor."

The point is that, in considering the Disaster Control Act, there is no doubt, as appellant SOA appears to acknowledge, that COVID-19 previously constituted a disaster and an emergency and that there remains, as SOA states in its brief, "a serious global health problem." Appellant PBA also does not seem to dispute that we remain in the midst of a disaster within the meaning of the Disaster Control Act, and the PBA does not appear to question, as stated in its brief, that Executive Order 283 "is rationally related to the goal of protecting the public" from the virus.

## C

Any argument that the Governor was not authorized by the Disaster Control Act is frivolous. To the extent it is further relevant to these appeals, we also find no merit in appellants' arguments that Chapter 103 limited the Governor's power to re-declare on January 11, 2022, the presence of a public health emergency under the Emergency Health Act.

## III

### A

Finding that the Governor was empowered to act, however, does not end our inquiry. Both appellants argue that the present circumstances obligated the Governor to impose less onerous requirements and that the order is not tailored

to the circumstances as they see them. That is, appellants make a similar, finer point: that the emergency has gone on too long and that this circumstance – the passage of time – permits only lesser measures rather than the vaccine mandate contained in Executive Order 283. The SOA describes what it means this way:

> There is no doubt that COVID-19 constituted a "disaster" and "emergency" under [the Disaster Control Act] at the time Governor Murphy issued [Executive Order 103]. Nor is there any doubt that COVID-19 remains a serious global health problem. However, it has been nearly two years since the Governor declared a State of Emergency under [the Disaster Control Act], and we remain in the midst of a global pandemic. It is clear that COVID-19 is here to stay despite the extensive efforts of the Governor to combat the spread of COVID-19.

Urging the lesson of Kubrick's <u>Dr. Strangelove</u>, the SOA seems to believe we all need to "learn to stop worrying and love the virus."[8]

---

[8] That is, the argument seems to be that because COVID-19 may eventually become endemic – something that appears "increasingly likely," as also noted by Dr. Edward Lifshitz, the Medical Director of the Infectious and Zoonotic Disease Program of the Communicable Disease Service within the New Jersey Department of Health – there still remains at times a need to protect against endemic diseases, like the flu. Protection seems particularly important – endemic or not – considering the rise of illnesses and hospitalizations that resulted from the Omicron variant and that additional variants, with unknown capabilities, may follow. Dr. Lifshitz advises that Omicron is much more transmissible than both the original and three times as contagious as the Delta variant. And, as the CDS points out, it is unclear what emerging new variants will bring.

In other words, this argument suggests that once disasters and emergencies are with us for more than a short while, they cease to be disasters and emergencies and simply become a way of life. We find, however, nothing in the Disaster Control Act or any of our jurisprudence that would support such an illogical or dangerous contention. Indeed, it may be far more logical to assume that the duration of the pandemic is not so much a product of the virus but a product of an unreasoned and unreasonable resistance to vaccinations of some of our fellow citizens that may be the very thing preventing our emergence from this pandemic and a return to normalcy.

That is, while apparently conceding the obvious – that we remain in the midst of a disaster – and while decrying the length of time that it has been upon us, appellants claim the Governor could not do more than before. The logic of this – let alone the legal sufficiency of the argument – escapes us. That lesser means have not produced the optimum effect more logically suggests the need for the employment of greater means.

Perhaps – although we sincerely doubt – reasonable minds might agree with what appellants argue is the best way to deal with the pandemic at this point in time. But that is not the question before us. What we have been asked to decide is <u>not</u> what we would do, <u>not</u> what appellants would do, and <u>not</u> what

15

amici would do. The question is whether the Governor was authorized to exercise his power as he did. As the Supreme Court of the United States recently observed in this same setting, it is not the courts' role to sift through the evidence to make the best choice; "that is the responsibility of those chosen by the people through democratic processes." Nat'l Fed'n of Indep. Bus., 142 S. Ct. at 666. Elections have consequences. In this State, the burden to make a rational determination as to the best way to proceed in these emergency situations falls on the Governor.

B

Once accepting the inescapable starting point that the Governor was and continues to be empowered to take steps in the face of this emergency, the question that remains is whether the steps incorporated in Executive Order 283 are consistent with that undertaking. As the Supreme Court defined the inquiry, the question for courts in such a situation is whether an emergency order "bears a rational relationship to the legislative goal of protecting the public." Worthington, 88 N.J. at 197-98; see also Kravitz, 468 N.J. Super. at 615. In considering whether there is a sufficient nexus between the emergency and the means employed to combat it, courts afford "the strongest of presumptions and the widest latitude of judicial interpretation." Worthington, 88 N.J. at 208

16

(quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). The Governor's powers under Disaster Control Act are to be "liberally construed to accomplish its crucial legislative purpose." Id. at 199. We do not, in considering whether appellants have sustained their heavy burden in attacking the actions taken, question whether evidence relied on for the Governor's action is sound or whether it constitutes "good policy." In re Veto by Governor Chris Christie of Minutes of N.J. Racing Comm'n, 429 N.J. Super. 277, 293 (App. Div. 2012).

The Supreme Court of the United States took this same approach in Jacobson v. Massachusetts, 197 U.S. 11, 26-27 (1905), in which it considered a challenge to a state law that required individuals to submit to vaccination against smallpox or face a fine or possible imprisonment. The Court recognized that the effectiveness of one approach to an emergency rather than another "is no part of the function" of our courts. Id. at 30. Similarly, in Sadlock v. Bd. of Educ. of Carlstadt, 137 N.J.L. 85, 87 (Sup. Ct. 1948), it was held that "[i]t is not the province of the court to pronounce that vaccination is or is not a suitable and satisfactory means of combating disease." Considering this highly deferential approach, it should be unsurprising that recently many courts, including this court, see City of Newark, 469 N.J. Super. at 382, have declined to intervene or

17

modify vaccination mandates because of an obvious and indisputable fact: vaccination mandates are a rational and permissible way to halt or limit the spread of the virus. See Does 1-6 v. Mills, 16 F.4th 20, 32 (1st Cir.), app. denied, 142 S. Ct. 17 (2021); We the Patriots USA, Inc. v. Hochul, 17 F.4th 266, 290 (2d Cir.), clarified, 17 F.4th 368 (2d Cir.), app. denied, 142 S. Ct. 552 (2021); Mass. Corr. Officers Federated Union v. Baker, __ F. Supp. 3d __ (D. Mass. 2021); Williams v. Brown, __ F. Supp. 3d __ (D. Or. 2021); Andre-Rodney v. Hochul, __ F. Supp. 3d __ (N.D.N.Y. 2021); Valdez v. Grisham, __ F. Supp. 3d __ (D.N.M. 2021); Bauer v. Summey, __ F. Supp. 3d __ (D.S.C. 2021); Maniscalco v. N.Y.C. Dep't of Educ., __ F. Supp. 3d __ (E.D.N.Y.), aff'd, __ F.4th __ (2d Cir. 2021).

C

Considering Executive Order 283 as it applies to appellants' members, we must be mindful that prisons and places of incarceration are, by their very nature, closed facilities that inevitably call for close contact. That makes them vectors for the spread of the virus. For that reason, the CDC has determined that "high COVID-19 vaccination coverage is critical to protect staff and people who are incarcerated/detained," and "[s]taff vaccination coverage is particularly

18

important given their frequent contact with the outside community, which creates the opportunity for potential introduction [of the virus] to the facility."

The record on appeal contains the certifications of the Acting Executive Director of the New Jersey Juvenile Justice Commission (JJC) and the Deputy Commissioner of the New Jersey Department of Corrections (DOC). These certifications recount that the JJC presently has custody of 184 residents in three secure facilities and ten residential community homes, and the DOC has custody of 12,333 inmates in eleven secure correctional facilities and eleven residential community release program facilities. The JJC employs 1,083 staff, 994 of whom are "covered workers" under Executive Order 283. The DOC employs 7,300, which includes 5,469 custody staff, including correctional police officers, and 1,831 civilian staff, including administrators, maintenance workers, food services and teachers.

Up until now, with testing, 229 JJC residents tested positive out of a total of 628 residents between March 2020 and January 25, 2022; 585 JJC staff members tested positive in that same time frame, more than half of the covered workers employed since testing began.

The JJC reports that in the last few months, the use of leave time due to the virus has "increased exponentially." In October 2021, 70 staff members took

A-1525-21

COVID-19 sick leave, in November the number rose to 126, in December it rose to 321, and in January, 231 took sick leave. Considering the overall number of employees, it is obvious that this has had a profound effect on JJC operations. We are told the JJC was required to temporarily close and consolidate housing units and deny vacation leave time while also requiring healthy staff to work more overtime. Unvaccinated staff, which comprises 32% of the workforce, were responsible for nearly half the positive cases.

The DOC's experiences are even more concerning. Despite weekly testing, positive cases among staff between July 27, 2020, and January 23, 2022, amount to 6,941 and, through a similar period, there were 10,139 positive cases among inmates. Despite the availability of vaccines, as of January 28, 2022, only 41.2% of staff reported they had received the primary series of a vaccine, paling in comparison to 61.6% of inmates in the same category. Not surprisingly, the DOC experienced significant COVID-related staff shortages. From December 2, 2021, to January 27, 2022, 3,309 staff members – 45.3% of the workforce – tested positive for the virus and were unable to report to work until completing a period of self-isolation. The DOC Deputy Commissioner has certified that this represents "the most critical staffing shortage the Department has ever had to face during" her more than twenty years at the DOC.

From a purely operational perspective, the lack of vaccinations has had a profound effect on the JJC's and the DOC's abilities to fulfill their functions. This circumstance provided ample reason for the inclusion of appellants' members within Executive Order 283.

D

If this were not enough, there is yet another consideration that appellants have barely paused to consider. The Eighth Amendment to the United States Constitution and Article I, Paragraph 12 of the New Jersey Constitution prohibit the infliction of cruel and unusual punishments. These commands impose on governments "a duty . . . to 'provide humane conditions' and 'take reasonable measures to guarantee the safety of the inmates" in their custody. In re Request to Modify Prison Sentences, 242 N.J. 357, 381 (2020) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)). As the Supreme Court of the United States explained, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to . . . provide for his basic human needs – e.g., food, clothing, shelter, medical care, and reasonable safety." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989). These rights extend to a point where exposing prisoners to others who have "infectious maladies" has been determined to

21

constitute a violation of the Eighth Amendment "even though the possible infection might not affect all of those exposed." Helling v. McKinney, 509 U.S. 25, 33 (1993).[9]

These principles lend considerable weight to the reasonableness of Executive Order 283's application to appellants' members.

E

In the final analysis, Executive Order 283 was undoubtedly a valid and rational exercise of the Governor's authority. In focusing solely on their own self-interests, appellants overlook that others are also impacted by the executive order.[10] Indeed, in seeking a stay, they place great weight in the momentary "invasion" of their members' bodies and their own unexplained unwillingness to be vaccinated, on the one hand, and little or no weight on the interests of their fellow citizens. As mentioned, appellants do not include in their suggested analyses of the problem before us the fact that their role is to supervise the incarcerated, whose interests are also entitled to consideration. The Attorney

---

[9] One federal district court has determined that California's failure to require vaccination of prison staff violates the Eighth Amendment. Plata v. Newsom, __ F. Supp. 3d __ (N.D. Cal. 2021).

[10] It appears that no other covered workers except the corrections officers within appellants' memberships have challenged Executive Order 283's vaccination mandate.

General points out that fifty-eight inmate COVID-19 related deaths have occurred since May 2020, there have been more than 10,000 positive cases among the prison population, and it is certainly true that "the conditions that prevent disease dissemination are nearly impossible to achieve" in correctional facilities. In Request to Modify Prison Sentences, 242 N.J. at 366, our Supreme Court recognized the extensive impact the virus has caused in our prisons: "[a]s of June 1, 2020, out of a total population of 15,302 inmates in state prison, 1,720 had tested positive for the virus, about 192 had been hospitalized, and 46 had died. Up to 737 out of 8008 staff members had also tested positive." Those numbers have only increased.[11] This evidence strongly suggests, as the Attorney General argues, that correctional facility staff members are "a vector of disease transmission between the community and incarcerated individuals" and "an avenue for COVID-19 to enter the prison." And yet, the sad fact remains that less than half of DOC officers and only slightly more than half of JJC correctional officers have been vaccinated.

---

[11] According to the DOC, there have been up until now 10,525 positive COVID tests among incarcerated individuals, 7,058 cumulative positives tests among its employees, and a total of 59 COVID-related deaths among the prison population.

The lack of enthusiasm among appellants' members for vaccinations and their beneficial effect – for both vaccinated individuals and those who come in contact with them – has had the additional pernicious effect of doing the very thing that concerns them now. That is, appellants argue that the vaccination mandate will cause staff shortages because they would rather walk away from their jobs than get vaccinated. They base this on rank speculation that their unvaccinated members will prefer retirement, resignation, or termination over vaccination. We question the legitimacy of that prognostication; we think it unlikely that appellants' members would rather face the possible loss of employment rather than permit a momentary jab in the arm.[12] But, even if the vaccination mandate may cause a reduction in the workforce through contumacy, the continuation of the vaccination-or-testing regime heretofore in

[12] There was similar speculation in the Fall of 2021 that Newark's vaccination mandate would generate a large reduction in force through retirements and terminations. The Attorney General advises that, in reality, 96% of the members of the Newark Department of Public Safety were in compliance with the vaccination mandate and there was a marked increase in vaccinated Newark police officers and firefighters as well. In other states that have imposed a similar mandate to that contained in Executive Order 283, the vaccination rate was also greatly increased. In Colorado, the vaccination rate for corrections staff that had been at 58% rose to 82%; similar increases were experienced in Oregon and Nevada. Closer to home, predictions of thousands of New York's finest walking off the job instead of complying with a vaccination mandate were highly erroneous. See Matthew Impelli, Only 89 NYC Cops on Leave Over Vaccine Mandate Despite Lawsuit, Union Opposition, Newsweek, Nov. 2, 2021.

A-1525-21

effect that they prefer, also leads to multitudes of positive tests, absences from work, and severe staff shortages in places of incarceration.

Testing alone has not and will not effectively combat the virus or slow its dissemination. It has been well-established that infected persons may not test positive for days after exposure; tested-but-positive corrections officers would be free to spread the virus in the closed facilities in which they work for days until their positive results arrive. These simple truths alone, fully supported by scientific evidence and simple logic,[13] demonstrate that any argument that the Governor issued an order with no rational connection to the disaster by imposing a vaccination mandate for appellants' members is specious and unworthy of further discussion. Vaccinations will undoubtedly result in fewer missed workdays, fewer staffing shortages, and – not to be omitted – a lesser burden on health workers, who must engage in the treatment of these illnesses generated by a stubborn refusal to be vaccinated. There appears to be no doubt, as stated

---

[13] We similarly reject appellants' conjecture that infection-induced immunity provides better protection against the virus than vaccines. The weight of scientific evidence on this point is to the contrary. Moreover, the contention that infection-induced immunity is a preferred approach toward herd immunity does not take into consideration – indeed it may not be known – the long-term problems caused by infection.

A-1525-21

by the American Medical Association, that "[t]he only way to truly end this pandemic is to ensure widespread vaccination."

F

Our review of the evidential material considered by the Governor in issuing Executive Order 283 inexorably leads to our finding of a rational link between the order and the many benefits – and little downside – it will bring in securing immunity by way of vaccination instead of through the lesser measures preferred by these appellants. Vaccinations will result in fewer missed workdays resulting from infections, and accelerated immunity via vaccination is far more likely to achieve a slowing of the rate at which variants will emerge as well as reduce the impact of future variants.

There is no doubt, as the Supreme Court of the United States recently said, that "COVID-19 is a highly contagious, dangerous, and . . . deadly disease" and that "a COVID-19 vaccine mandate will substantially reduce the likelihood" of contracting and transmitting the disease. Biden v. Missouri, 142 S. Ct. 647, 653 (2022) (upholding a similar vaccination mandate for health care workers and observing that this directive constituted a "straightforward and predictable example of the 'health and safety' regulations" a federal agency may impose). The CDC determined in November 2021 from data emanating during the Delta

A-1525-21

wave that unvaccinated adults were four times more likely to be infected and fifteen times more likely to die from the virus as compared to fully-vaccinated adults. When compared to vaccinated adults with a booster, unvaccinated adults were thirteen times more likely to be infected and sixty-eight times more likely to die after a COVID-19 infection. And, as the Omicron variant displaced Delta, the New Jersey Department of Health determined that from mid-December 2021 to mid-January 2022, the rate of infections among unvaccinated New Jerseyans was more than two-and-one-half times greater than that of the fully vaccinated, and more than twelve times greater than that of the fully vaccinated with a booster.

Executive Order 283 represents a rational and measured response to our present circumstances. Appellants' arguments to the contrary are without merit.

IV

Appellants argue that even if Executive Order 283 was authorized and was a rational response to the situation, other reasons preclude its enforcement against them. They argue that the executive order infringes on their substantive due process rights, violates collective negotiation rights, impairs contractual rights, conflicts with civil service regulations, and violates the APA rulemaking requirement. We find insufficient merit in these arguments to warrant further

A-1525-21

discussion in a written opinion, R. 2:11-3(e)(1)(E), adding only the following few comments.

First, constitutional principles do not provide appellants' members with a constitutional right to refuse a vaccination. To be sure, a vaccination is an "invasive" procedure, see, e.g., State v. Adkins, 221 N.J. 300, 304 (2015), but the federal and state constitutions recognize that the imposition of a vaccination requirement in the face of a public health emergency is a proper exercise of the police power, Jacobson, 197 U.S. at 12-13; Sadlock, 137 N.J.L. at 91, and may override the individual's right to object to the invasive procedure. As we said recently in City of Newark, "employees have the right to get vaccinated and keep their jobs or decide that they do not want to work for the common good," and a governmental employee's choice, in this setting, is not worthy of constitutional protection because "it has long been established that there is no constitutional or statutory right to a government job," 469 N.J. Super. at 386-87, a determination consistent with the Supreme Court's holding in Greenberg v. Kimmelman, 99 N.J. 552, 573 (1985) that "[t]he right to a particular job . . . has never been regarded as fundamental."[14]

_____

[14] Indeed, although that might be the ultimate consequence of a decision not to comply with Executive Order 283, the choice for these appellants' members is

Second, we reject the argument that Executive Order 283 violates appellants' collective negotiations rights for essentially the same reasons we rejected a similar argument in City of Newark, 469 N.J. Super. at 385-86. Not all areas are negotiable. Instead, negotiability requires a consideration of the employee's legitimate interests and the potential for impairing governmental policy. In re Local 195, IFPTE, 88 N.J. 393, 402 (1982). The imposition of a vaccination mandate in the face of a national public emergency constitutes the exertion of a non-negotiable governmental prerogative.

Third, appellants' invocation of the contracts clause, N.J. Const. art. IV, § 7, ¶ 3 (protecting individuals from laws "impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made"), is unavailing for the same reason their collective-negotiations arguments are unavailing. Any contracts that appellants believe have been impaired are those that were produced by collective negotiations. Moreover, the contract clause cannot override the power of the State's chief

---

really no more than comply with the vaccination mandate or face a disciplinary proceeding that <u>may</u> include termination. The order does not declare that a covered worker must comply or not return to work. Workers are entitled to have their circumstances considered in a disciplinary proceeding of some form.

executive officer to utilize the police power to protect the welfare of the State's citizens.

Fourth, we reject the similar argument that Executive Order 283 violates or impairs civil service regulations. Our Supreme Court recognized in Worthington, 88 N.J. at 200 (quoting United States v. Yoshida Int'l, Inc., 526 F.2d 560, 583 (Cust. & Pat. App. 1975)), that "if every law applicable to tranquil times were required to be followed in emergencies, there would be no point in delegating emergency powers and no adequate and prompt means for dealing with emergencies." See also Kravitz, 468 N.J. Super. at 622.

Fifth, appellants argue that the issuance of the executive order violates the New Jersey Administrative Procedure Act, N.J.S.A. 52:14B-1 to -31. In particular, they argue that N.J.S.A. 52:14B-2 requires rulemaking for "each agency statement of general applicability and continuing effect that implements or interprets law or policy." Appellants' assertion, however, misinterprets the scope of this statute because it does not include "the office of the Governor" within its definition of "agency." Ibid. Moreover, the power to issue executive orders is "an accepted tool of gubernatorial action" when the order "flows out of the Governor's legislatively-delegated emergency powers to act on behalf of the

safety and welfare . . . under the Disaster Control Act." <u>Commc'ns Workers of Am., AFL-CIO v. Christie</u>, 413 N.J. Super. 229, 254, 259 (App. Div. 2010).

V

As noted earlier, the matter first came before this court when we permitted appellants to move on an expedited basis for an order staying Executive Order 283. Having now decided, without objection, the merits of the appeal, we need no longer entertain the motion for a stay. For the sake of completeness, however, we offer the following comments as to why – had we not decided the merits – we would have denied the motion for a stay.

Well-established principles require that a party seeking a stay pending appeal must, as a general matter, establish: a reasonable probability of success on the merits; a balancing of the equities and hardships favors relief; the harm caused by the absence of a stay is substantial, immediate and irreparable; and the public interest will not be harmed. <u>See</u> <u>Crowe v. De Gioia</u>, 90 N.J. 126, 132-34 (1982); <u>see also</u> <u>Waste Mgmt. of N.J., Inc. v. Union Cnty. Util. Auth.</u>, 399 N.J. Super. 508, 519-20 (App. Div. 2008) (recognizing a less rigid standard for imposition of interlocutory injunctive relief when designed solely to preserve the status quo).

For the reasons already discussed, appellants did not, from the outset, possess a reasonable likelihood of success and have been shown here to have no valid claim at all. The other factors, which greatly overlap in this particular setting, also counsel against issuance of a stay. For example, we see no semblance of irreparable injury because there has been no showing that the vaccination causes harm or that a mere jab in the arm, although invasive, is of such magnitude that it deserves much weight in this analysis. Moreover, Executive Order 283 does not preclude a finding of an exemption in individual cases based on such a showing that a vaccination would cause harm or restrict religious rights wherever applicable. A weighing of the equities and hardships likewise weighs against a stay. If we grant a stay, we would merely be sparing appellants' unvaccinated members of the momentary inconvenience of a needle jab to their arms. If we deny a stay, then society in general as well as those who work with appellants' members or are incarcerated where they work face the increased danger of contracting the virus. So viewed, this factor heavily weighs against the imposition of a stay.

Indeed, appellants' inconvenience or momentary discomfort barely nudges the scales despite their attempt to view their alleged predicament, as one federal district judge described it, as a Hobson's choice between a jab and a job. <u>See</u>

<u>Feds for Med. Freedom v. Biden</u>, __ F. Supp. 3d __, __ (S.D. Tex. 2022). Appellants' self-centered construct of "jabs vs. jobs" misses the point. There is no Hobson's choice, and this is not how we should view the balancing-of-the-hardships factor. The balancing is between the "jab" and the harm to society caused by the lack of jabs. Even if the hardships are viewed as appellants suggest – and even if Executive Order 283 poses a conflict between their jobs and the societal benefit to be gained by the vaccinations required – we would conclude that the latter greatly outweighs the former.

And, lastly, the legal principles informing the decision to issue a stay requires a consideration of the public interest, which must not be unduly impacted by a stay. Everything we have said expresses our belief, in applying the standards applicable to stay motions, that the public interest would be greatly harmed and disserved if we were to grant appellants any relief from the application and enforcement of Executive Order 283.

* * *

To summarize, we conclude that the Governor was fully empowered under the Disaster Control Act to enter Executive Order 283. To the extent necessary to our decision, we find the executive order was authorized by the Emergency Health Act. We also have no hesitancy in concluding that Executive Order 283

33

– as it applies to appellants – is rationally tailored to the problem recognized by the Governor. And we are satisfied that the individual rights asserted by appellants are of minimal weight when compared to the greater good that Executive Order 283 seeks to foster and establish. See We The Patriots, 17 F. 4th at 293 n.35 (recognizing that "urgent public health needs of the community can outweigh the rights of an individual to refuse vaccination").

In the final analysis, there are times when individual self-interests like those asserted by appellants must take a backseat to the responsibilities we all have toward each other, a point President Kennedy far more eloquently expressed in his 1961 inaugural address.

The appeals are dismissed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1525-21